

FILED

DEC 3 0 2025

Heidi D. Campbell, Clerk
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF OKLAHOMA

( 1 ) LAZY S RANCH PROPERTIES, LLC,  )
                                      )
                    Movant,           )
                                      )
        vs.                           )       Case No. 2 5 MC - 0 2 7 SEH - JFJ
                                      )
( 4 ) LINDE SERVICES, INC.,           )
                                      )
                    Respondent.       )

### LAZY S RANCH PROPERTIES, LLC'S MOTION TO COMPEL RESPONDENT LINDE SERVICES, INC. TO COMPLY WITH SUBPOENA DUCES TECUM

Lazy S Ranch Properties, LLC ("Lazy S") moves, pursuant to FED.R.CIV.P.

45(d)(2)(B)(i), for an order compelling Respondent Linde Services, Inc. ("Linde") to produce

certain documents responsive to a subpoena duces tecum, which Linde has refused and failed to

produce.

### BACKGROUND

Pending in the Eastern District of Oklahoma is the matter of *Lazy S Ranch Properties,*

*LLC v. Valero Terminaling and Distribution Company, Valero Partners Operating Co. LLC, and*

*Valero Partners Wynnewood, LLC*, Case No. 19-cv-425-JWB ("Underlying Action"). It involves

claims of negligence and nuisance, both public and private, against Defendants Valero

Terminaling and Distribution Company, Valero Partners Operating Co. LLC, and Valero

Partners Wynnewood, LLC's (collectively, "Valero"). Valero's pipeline, which extends 30 miles

from its Ardmore, Oklahoma refinery to its Wynnewood, Oklahoma terminal, crosses the Lazy S

Ranch, and is releasing petroleum products into the environment of the Lazy S Ranch.

Discovery was long closed and the case set for jury trial in July 2025, until on May 14,

2025 Valero informed the Court and Lazy S that it had just completed an alleged "successful"

*Fees paid
∅ summons*

hydrostatic test of the portion of the pipeline crossing the Lazy S Ranch, which Valero claimed demonstrated the pipeline was not leaking. Lazy S objected to the late introduction of the hydrostatic test. While the Court recognized the potential importance of such evidence, because of the late notice, the Court continued the jury trial and set a discovery schedule for hydrostatic test discovery, which essentially required discovery to be completed by late September, with the jury trial reset to January 2026. These discovery deadlines and the jury trial were later extended due to the conduct of Valero and its hydrostatic test contractors.

Immediately after the Court reopened discovery for the hydrostatic test, Lazy S issued interrogatories and requests for production to Valero. Once Lazy S received Valero's initial responses and documents on June 30, 2025 and learned the identity of third-party contractors who performed services on the hydrostatic test, Lazy S served subpoenas on the third-party contractors for documents related to the hydrostatic test, such as Linde. Lazy S served a subpoena duces tecum on Linde on July 3, 2025 via its registered service agent in Tulsa, Oklahoma. [Exhibit 1, Subpoena Duces Tecum] Those documents were due to be produced on July 17, 2025. *Id*.

In addition to the pressure-related hydrostatic test on the subject pipeline, Valero also employed a leak detection contractor as a second means to attempt to demonstrate its claim that the pipeline was not releasing petroleum products under the Lazy S Ranch and causing pollution of the Lazy S Ranch springs. Linde provided leak detection services, which involved injecting certain chemicals into the hydrostatic test water and then at some time after the hydrostatic test, a Linde employee walking over the surface of the buried pipeline pulling a sled to collect the vapors emanating from the buried pipeline. Thus, the sled attempts to capture (sample) the chemicals Linde claims would be released from the pipeline if the pipeline had a leak. (Both the

actual hydrostatic pipeline pressure test as well as and the Linde leak detection tests are referred hereafter jointly as the "Valero's hydrostatic test").

Lazy S's subpoena sought Linde's records with respect to its work on Valero's hydrostatic test and compelled compliance in Tulsa, Oklahoma, while allowing for the electronic production of the records via email or download link. There was no requirement for any person with Linde to appear with the document production. [Exhibit 1 at 4, Subpoena Duces Tecum]

Linde's initial response to the subpoena was a July 10, 2025 letter from Joan C. Luu, its Assistant General Counsel – Litigation, which asserted several generic objections, but failed to tie any of the objections to the documents identified in the subpoena, nor did it raise that objection it now claims, five months later, to protect the documents from production. [Exhibit 2, Letter dated July 10, 2025] Linde also requested an extension of time to July 31, 2025 to respond. *Id*. Lazy S agreed to the extension.

In an email dated July 30, 2025, Ms. Luu requested a further two-week extension because of "vacations and other scheduling constraints." [Exhibit 3, Email dated July 30, 2025] Ultimately, Linde produced its first set of documents via an email with a download link on August 28, 2025, but objected to producing certain documents related to the chemicals and their properties of tracer gas, as Linde claimed these were trade secrets. [Exhibit 4, Email dated August 28, 2025]

Linde produced a second set of documents via an email with a download link on October 14, 2025, after the Court had decided Lazy S's Motion to Compel [Dkt. 450, Underlying Action] against Valero regarding Valero's claims of attorney-client privilege related to communications between Linde's personnel and Valero and its counsel. [Exhibit 5, Email dated October 14, 2025] Thereafter, discussions continued between Lazy S and Linde regarding certain outstanding

documents. Linde produced its third set of documents via email and with a download link on November 19, 2025. Lazy S then deposed three Linde employees on November 20-21, 2025. [Exhibit 6, Email dated November 25, 2025]

After the conclusion of the depositions of the Linde employees, Lazy S followed up with a letter to Linde on November 25, 2025 regarding five areas of documents that were covered by the Lazy S subpoena but had not been produced. [Exhibit 7, Letter dated November 25, 2025] After several email prompts by Lazy S, Linde finally responded on December 11, 2025, producing its fourth set of documents via email and resolving several of the issues from the November 25, 2025 letter but leaving one area unresolved. [Exhibit 8, Email dated December 11, 2025] This area related to employee training, specifically (1) what training had Linde employees on the Valero hydrostatic test received and (2) the training materials used for the training of such employees. After further inquiry by Lazy S, Linde produced its fifth set of documents via email on December 12, 2025, which were the records of what training the Linde employees on the Valero hydrostatic test had received. [Exhibit 9, Email dated December 12, 2025] As a result, the dispute further narrowed to only one area related to employee training; the training materials used for the training of the Linde employees who performed the work on the Valero hydrostatic test. Lazy S seeks an order compelling Linde to produce those training materials.

## CERTIFICATION OF MEET AND CONFER

Counsel for Lazy S and Linde, in addition to numerous electronic communications, discussed the documents at issue in a telephone conference on December 11, 2025. Linde's position is that the requested training materials are not within the scope of Lazy S's subpoena. Lazy S's position is that the requested training materials are within the scope of Lazy S's subpoena. Counsel for these parties understand each other's positions but do not agree on

whether the requested training materials are within the scope of Lazy S's subpoena. Lazy S's

counsel is in Tulsa, Oklahoma and Linde's counsel is in Birmingham, Alabama, a distance of

655 miles, which renders a personal conference infeasible.

## ARGUMENT AND AUTHORITIES

**I.      The Documents Withheld by Linde are Responsive to the Subpoena Duces Tecum.**

Lazy S served Linde's registered service agent in Tulsa, Oklahoma on July 3, 2025,

which Linde represented it received the subpoena from its service agent on July 7, 2025. [Exhibit

2, Letter dated July 10, 2025] Linde had the option of responding/objecting to the subpoena on

the earlier of the date of compliance or 14 days after service. FED.R.CIV.P. 45(d)(2)(B). Failure

to object constitutes a waiver.

> Failure to object within the required 14-day time period generally results in
> waiver of the contested issues. Waiver occurs whether the objections are
> substantive or procedural in nature.

*Copeland v. C.A.A.I.R., Inc.*, 2024 U.S. Dist. LEXIS 34000 *12-13, 2024 WL 841215 (N.D.

Okla. February 28, 2024) (citations omitted). In response to the subpoena, Linde's Assistant

General Counsel – Litigation, Joan C. Luu, emailed a letter on July 10, 2025, asserting several

generic objections, as follows:

> LSI objects to this subpoena to the extent that it seeks confidential and privileged
> information, is overly broad, unduly burdensome, is not reasonably limited in
> scope as to time and geographic locale, seeks irrelevant information, and is not
> reasonably calculated to lead to the discovery of admissible evidence.

[Exhibit 2, Letter of July 10, 2025] However, Linde made no effort to tie any objection to any of

the requested documents in the subpoena. Generally, boilerplate objections are ineffective.

*Howard v. Segway, Inc.*, 2013 U.S. Dist. LEXIS 31402, *6-8 (N.D. Okla. Mar. 7, 2013)

("general or boilerplate objections, offered without explanation, may constitute a waiver of the

responding party's right to object") (collecting cases).

The subpoena designated the place of compliance as the office of Lazy S's counsel in Tulsa, Oklahoma. Linde never objected to the place of compliance, and Linde produced five sets of documents via email, either attached to an email, or provided a download link in an email, or both. Linde has waived any objection as to the place of compliance. *Copeland*, 2024 U.S. Dist. LEXIS 34000 at *13-14 (failure to assert place of compliance objection in written objections and failure to file motion to quash constituted waiver of place of compliance). In producing its five sets of documents by electronic means, Linde has also waived the 100-mile requirement for the place of compliance. *See Rsui Indem. Co. v. NRA of Am.*, 2020 U.S. Dist. LEXIS 127711 *4, 2020 WL 4194526 (W.D. Okla. July 21, 2020) (in dicta, the court interpreted the Advisory Committee Note to the 2013 Amendments to Rule 45 "to mean that a subpoenaed third party can waive the 100-mile requirement by agreeing to transmit production by electronic means.").

The documents remaining at issue under the Linde subpoena are the training materials Linde used to train its employees who worked on the Valero hydrostatic test, as described in a letter to Linde's counsel as follows:

3.  All documentation of the training received by the Linde employees who performed the Linde/Valero Job.

[Exhibit 7, Letter dated November 25, 2025] The relevant category in the subpoena reads as follows:

1.  All documents relating to Linde Services, Inc.'s performance of Job No. CG-05466, including but not limited to field notes, records of when Linde Services, Inc.'s personnel were on site performing services as well as an inclusive list of the scope of the services provided by each individual and the date or dates when the individual performed that service.[1]

_____

[1] Unbeknownst to Lazy S, because Linde's final report only referenced Job No. CG-05466, Linde also used a second job number, CG-06119. Job No. CG-05466 covered placing the chemicals in the pipeline, a process known as inoculation, and Job No. CG-06119 covered the sledding over the pipeline to collect vapors in an attempt to identify where, if anywhere, the tracer gas was released from a leak in the pipeline. Lazy S's subpoena only expressly covered

[Exhibit 1, Subpoena Duces Tecum]

The issue here is whether the scope of the subpoena includes the training materials for the jobs performed by the Linde employees who worked on the Valero hydrostatic test. Linde has already identified the training received by each employee on the Valero hydrostatic test by providing records which identify the name of each training course completed by each employee. Linde has failed to produce the training materials associated with each of those courses. In order for Linde's employees to perform the services offered by Linde on the Valero hydrostatic test, those employees needed to be trained in the proper procedures to perform this work. Evidence of the training the employees received, as well as the training materials used to train the employees, is directly related to Linde's performance on Valero's hydrostatic test (whether the employees were competent to perform the tests) and thus covered by Lazy S's subpoena.

The November 25, 2025 letter followed the depositions of three Linde employees who were involved with the Valero hydrostatic test. These three depositions confirmed the relevance of the training materials to a proper analysis and evaluation of the services Linde provided to Valero on the hydrostatic test. [Exhibit 10, Ray Cimijotti Deposition, 45-48, 164-172; Exhibit 11, Kel Lintner Deposition, 8:6-23, 9:1-5, 14:16-23, 15-16, 17:1-18, 18: 17-23, 19:1; Exhibit 12, Chris Toda Deposition, 17-51]

Linde's proprietary tracer leak detection methodology is dependent on its employees' understanding and performance of the leak detection methodology and the specific set of complex tasks and procedures they are required to execute for reliable implementation of this sampling and testing methodology. The Linde employees who conducted the leak testing on the

---

Job No. CG-05466. However, Linde recognized that the Valero job entailed both job numbers and its document production has produced documents from both job numbers. [Exhibit 4, Email dated August 28, 2025]

Lazy S ranch have testified regarding how they conducted their work. There is also a limited set of field notes describing some aspects of the tracer test. In the absence of the ability to review the training materials relied upon by these Linde employees, it is not possible to assess the degree to which the tracer leak detection work that they conducted on the Lazy S Ranch was properly performed as conforming to their formal training.

The training materials are relevant to the question of Linde's leak detection performance on the subject pipeline and, thus related to Linde's performance of its services on the subject pipeline and covered by the subpoena. This goes directly to the issue in the Underlying Action as to whether Valero's pipeline is leaking under the Lazy S Ranch. Linde has produced some of the training-related records but refuses to produce the training materials from the courses used to train the employees on Valero's job for tasks they purportedly performed for Valero, even though an extensive protective order exists in the case. [Dkt. 376, Underlying Action] Linde should be compelled to immediately produce the training materials.

WHEREFORE, Lazy S respectfully requests the Court grant its Motion to Compel Respondent Linde Services, Inc. to Comply with Subpoena Duces Tecum.

Respectfully submitted,

David P. Page, OBA No. 6852
Charles R. Willing, OBA No. 15873
**Environmental Energy and Natural
Resources Advocates, PLLC**
1921 S Boston Ave
Tulsa, Oklahoma 74119
Telephone: 918.764.8984
Email:    dpage@eenradvocates.com
          cwilling@eenradvocates.com

- and -

Jeffery L. Carmichael
Robert Coykendall
**Morris, Laing Law Firm**
300 N. Mead, Suite 200
Wichita, Kansas 67202
Telephone: (316) 262-2671
Email:    jcarmichael@morrislaing.com
          rcoykendall@morrislang.com

***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on December 30, 2025, I filed the foregoing document with the Clerk of the Court for the U.S. District Court, Northern District of Oklahoma. I further certify that on December 30, 2025, the foregoing document was served on counsel for Respondent Linde Services, Inc. and counsel for Valero in the Underlying Action via email.

David B. Hall
Wilson Elser Moskowitz Edelman & Dicker LLP
1500 Urban Center Drive, Suite 450
Birmingham, AL 35242
david.hall@wilsonelser.com
*Attorneys for Respondent Linde Services, Inc.*


jbennett@dowdbennett.com
mheinsz@dowdbennett.com
mjohnson@dowdbennet.com
pcantwell@dowdbennett.com
asmith@dowdbennett.com
bbarnes@dowdbennett.com
sjantzen@ryanwhaley.com
pwhaley@ryanwhaley.com
glucky@ryanwhaley.com

*Attorneys for Defendants Valero Terminaling
and Distribution Company, Valero Partners
Operating Co. LLC, and Valero Partners
Wynnewood, LLC
Case No. 19-cv-425-JWB, Eastern District of Oklahoma*

_____
David P. Page

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Eastern District of Oklahoma

**Exhibit 1**

LAZY S RANCH PROPERTIES, LLC

*Plaintiff*

v.
VALERO TERMINALING AND DISTRIBUTION
COMPANY, ET AL.

*Defendant*

Civil Action No. 19-cv-425-JWB

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:
Linde Services, Inc., c/o United Agent Group Inc., Registered Service Agent
624 S Denver Ave., Suite 300, Tulsa, OK 74119

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Exhibit A, attached hereto.

| Place: Energy Environmental & Natural Resources Advocates, PLLC, 1921 S Boston Ave., Tulsa, OK 74119 | Date and Time: July 17, 2025, 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 7/3/25

*CLERK OF COURT*

OR

_____
*Signature of Clerk or Deputy Clerk*

_____
*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Lazy S Ranch Properties, LLC , who issues or requests this subpoena, are:

Charles R. Willing, EENR Advocates, 1921 S Boston, Tulsa, OK 74119, 918-764-8984, cwilling@eenradvocates. com

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 19-cv-425-JWB

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*

on *(date)*                           .

    ☐ I served the subpoena by delivering a copy to the named person as follows:

_____

                                             on *(date)*                      ; or

    ☐ I returned the subpoena unexecuted because:

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$

My fees are $                    for travel and $                    for services, for a total of $      0      .

I declare under penalty of perjury that this information is true.

Date:

_____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:

(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**

The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## EXHIBIT A

DOCUMENTS TO PRODUCE: With respect to Linde Services, Inc.'s Job No. CG-

05466, the following documents shall be produced:

1. All documents relating to Linde Services, Inc.'s performance of Job No. CG-05466, including but not limited to field notes, records of when Linde Services, Inc.'s personnel were on site performing services as well as an inclusive list of the scope of the services provided by each individual and the date or dates when the individual performed that service.

2. All communications, including but not limited to correspondence, email, text messages, and messaging apps (such as Messages, Whatsapp, Signal, Telegram), between Linde Services, Inc. and Valero Partners Wynnewood (including any Valero-related entity) related to Job No. CG-05466.

3. All documents related to any leak simulations performed at the site as part of Job No. CG-05466 to verify that the site conditions are suitable for SeeperTrace$^{TM}$.

4. All documents related to the identity, chemical composition, characteristics, and properties of the tracer chemicals (including, but not limited, to gases, isotopes, solutes, or solvents) used on Linde Services, Inc.'s Job No. CG-05466.

5. A legible copy of all calculations made as a part of the services performed on Job No. CG-05466.

6. All photos and videos related to Job No. CG-05466.

Please note that if the responsive materials are kept in an electronic format, for example, such as emails, Microsoft Word or Excel files, or Adobe portable document files, then those responsive materials shall be produced in their native electronic format.

The production of all responsive materials may be satisfied by electronic production by (a) emailing the electronic documents to cwilling@eenradvocates.com or, if such electronic documents are too large to email, (b) contacting Charles Willing at cwilling@eenradvocates.com, who will then provide you a link to upload the electronic documents.

# Exhibit 2



**Joan C. Luu**
Assistant General Counsel - Litigation

Linde Inc.
**Law Department**
**10 Riverview Drive**
**Danbury, CT 06810-5113**
**Direct Dial 203.837.2275**
**Fax Number 203.837.2129**
**Joan.Luu@linde.com**

July 10, 2025

*Via Email (cwilling@eenradvocates.com)*

Charles R. Willing, Esq.
EENR Associates
1921 South Boston Avenue
Tulsa, OK 74119

> **Re: Third-Party Subpoena issued to Linde Services**
> **Inc. in the Matter of Lazy S Ranch Properties,**
> **LLC v. Valero Terminaling and Distribution**
> **Company, et al.**

Dear Mr. Willing:

This letter is in response to the above-referenced third-party subpoena issued to Linde Services Inc. ("LSI") and received on July 7, 2025 for responsive documents to be produced on July 17, 2025.

LSI objects to this subpoena to the extent that it seeks confidential and privileged information, is overly broad, unduly burdensome, is not reasonably limited in scope as to time and geographic locale, seeks irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the foregoing objections, LSI will agree to conduct a reasonable search for records responsive to the subpoena. We will need an extension of time until July 31, 2025 to respond. If you have any objections to the request for an extension, please let us know immediately.

Sincerely yours,

*Joan C. Luu*

Joan C. Luu

cc: Ed Balzarini

| | |
|---|---|
| **Subject:** | RE: Third-Party Subpoena issued to Linde Services Inc. in the Matter of Lazy S Ranch Properties, LLC v. Valero Terminaling and Distribution Company, et al. |
| **Date:** | Wednesday, July 30, 2025 at 12:05:24 PM Central Daylight Time |
| **From:** | Joan Luu |
| **To:** | Charles Willing, Edward Balzarini, Hall, David B. , Herrin, Kimberly D. |
| **CC:** | David Page, Matthew Johnson |

**Exhibit 3**

**Attachments:** image001.png, image002.jpg, image003.jpg

Mr. Willing,

Due to vacations and other scheduling constraints, we anticipate we will need another two-week extension to respond to the subpoena.  Please advise if you are objecting to our request.

I have also included on this email our outside counsel who is assisting us in responding to this subpoena.  You will be receiving the production directly from them, in case you need to take measures to ensure their emails are not automatically transferred to your spam folder.

Thanks,
Joan


Joan C. Luu
Assistant General Counsel - Litigation
Linde
10 Riverview Drive
Danbury, CT 06810
Phone:  (203) 837-2275
Cell:  (475) 206-8893



Making our world
more productive


**From:** Charles Willing <cwilling@eenradvocates.com>
**Sent:** Friday, July 11, 2025 10:42 AM
**To:** Edward Balzarini <Edward.Balzarini@linde.com>; Joan Luu <Joan.Luu@linde.com>
**Cc:** David Page <dpage@eenradvocates.com>; Matthew Johnson <mjohnson@dowdbennett.com>
**Subject:** FW: Third-Party Subpoena issued to Linde Services Inc. in the Matter of Lazy S Ranch Properties, LLC v. Valero Terminaling and Distribution Company, et al.

**CYBERSECURITY ALERT: This is an email from an external organization. Use caution, especially with links and attachments.**

M
or
e

We agree to your request for an extension to July 31, 2025 to respond to the subpoena.

Please note that there is a Protective Order in place in this case and I've attached a copy for your convenience. To the extent any of the responsive materials fall under any of the categories in the Protective Order, please make the appropriate designation on those materials before production.

I've also copied Matt Johnson, the lead attorney for the Defendants in this matter.

If you have any questions, please let us know.

Thanks.

Best regards,
Chuck Willing



**Charles R. Willing** | Member | **EENR Advocates**
1921 S Boston Ave | Tulsa, Oklahoma 74119
Phone: 918.764.8984 | **cwilling@eenradvocates.com**

This communication may be protected by the attorney-client privilege and may contain confidential information. If it has been sent to you in error, please reply to the sender that you received it and then delete the message. Any dissemination, distribution, copying or reproduction of this message other than by its intended recipient is strictly prohibited.

---

**From:** Edward Balzarini <Edward.Balzarini@linde.com>
**Date:** Thursday, July 10, 2025 at 9:24 AM
**To:** Charles Willing <cwilling@eenradvocates.com>
**Cc:** Joan Luu <Joan.Luu@linde.com>
**Subject:** Third-Party Subpoena issued to Linde Services Inc. in the Matter of Lazy S Ranch Properties, LLC v. Valero Terminaling and Distribution Company, et al.

Please see attached.

Thank you,
-Ed

Edward F. Balzarini
Litigation Coordinator
Law Department

Linde Inc.
10 Riverview Drive, Danbury, CT 06810
Phone: (203) 837-2092, Fax: (203) 837-2129

Edward.Balzarini@linde.com, www.linde.com



This e-mail, including any attachments, is intended solely for the person or entity to which it is addressed and may contain confidential, proprietary and/or non-public material. Except as stated above, any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than an intended recipient is prohibited. If you receive this in error, please notify the sender and delete the material from any media and destroy any printouts or copies.

The information contained in this email and any attachments may be confidential and is provided solely for the use of the intended recipient(s). If you are not the intended recipient, you are hereby notified that any disclosure, distribution, or use of this e-mail, its attachments or any information contained therein is unauthorized and prohibited. If you have received this in error, please contact the sender immediately and delete this e-mail and any attachments. No responsibility is accepted for any virus or defect that might arise from opening this e-mail or attachments, whether or not it has been checked by anti-virus software.

The information contained in this email and any attachments may be confidential and is provided solely for the use of the intended recipient(s). If you are not the intended recipient, you are hereby notified that any disclosure, distribution, or use of this e-mail, its attachments or any information contained therein is unauthorized and prohibited. If you have received this in error, please contact the sender immediately and delete this e-mail and any attachments. No responsibility is accepted for any virus or defect that might arise from opening this e-mail or attachments, whether or not it has been checked by anti-virus software.

# Exhibit 4

| Subject: | Lazy S Ranch Properties, LLC v. Valero Terminaling and Distribution Company, et al. - Linde Services Inc.'s subpoena response |
| --- | --- |
| Date: | Thursday, August 28, 2025 at 5:16:50 PM Central Daylight Time |
| From: | Hall, David B. |
| To: | Charles Willing, David Page |
| CC: | Matthew Johnson, Ben Barnes, Shannon Koelsch, Hall, David B., Walsh, Andrew P., Herrin, Kimberly D., Marler, Lori |

Attachments: image001.jpg

Please see Linde Services Inc.'s f/k/a Praxair Services, Inc. ("LSI") initial Confidential production in response to the six (6) Exhibit A to Plaintiff Lazy S Ranch Properties, LLC's Rule 45 subpoena *duces tecum*. All of the requested documents relate to the contract work LSI performed at the Wynnewood pipeline as part of LSI Job No. CG-05466, specifically including the initial tracer inoculation in early May 2025 and the subsequent SeeperTrace$^{TM}$ sledding on June 2, 2025. Please note that Job No. CG-05466 only covered the work performed in May 2025. The latter SeeperTrace$^{TM}$ testing was performed pursuant to separately Job No. CG-06119, a copy of which is included in the Confidential production. Nevertheless, in the interest of cooperation, LSI's production includes documents responsive to both Job No. CG-05466 and Job No. CG-06119.

Also, Defendant provided a privilege log reflecting its withholding of certain June 2025 email correspondence. Defendant contends that the claimed attorney-client privilege extends to those records and advises that it asserts it as the holder of that privilege. In light of Defendant's invocation of privilege, we are withholding the production of these emails until Plaintiff and Defendant resolve this issue.

Also, LSI is objecting to Requests 3, 4 and 5, which broadly request production of documents regarding the SeeperTrace$^{TM}$ process, and the tracer chemical injected into the pipeline during the initial inoculation work. LSI's leak detection processes and tracer chemicals are highly sensitive and proprietary trade secrets that have been carefully guarded since the company was known as Tracer Research Corp. *See, e.g., Tracer Research Corp. v. Nat'l Env't Serv. Co.*, 843 F. Supp. 568 (D. Ariz. 1993). LSI objects to producing any of its trade secrets because their disclosure involves a serious risk of irreparable harm. It is not readily apparent that the requested trade secrets serve any evidentiary purpose, and we further believe sufficient publicly available information exists to verify the efficacy of LSI's leak detection work without needless disclosure of trade secrets. To the extent Plaintiff believes otherwise, we kindly request the opportunity to meet and confer to further discuss the asserted requests and LSI's objection thereto.

Below is a link to the documents produced as L 0001-0087. Please let us know if you have trouble accessing the materials.

█████████████████████████████████

**David B. Hall**
Attorney at Law
Wilson Elser Moskowitz Edelman & Dicker LLP
1500 Urban Center Drive Suite 450
Birmingham, AL 35242
205.709.8980 (Direct)

205.572.1462 (Cell)
205.709.8979 (Fax)
David.hall@wilsonelser.com



IMPORTANT NOTICE: Beware of Cyber Fraud.
You should NEVER wire money to any bank account that Wilson Elser
Moskowitz Edelman & Dicker LLP provides to you either in the body
of this or any email or in an attachment without first speaking
with the attorney in our office who is handling your transaction.
Further, DO NOT accept emailed wire instructions from anyone else
without voice verification. Even if an email looks like it has come
from this office or someone involved in your transaction,
CALL US FIRST AT A NUMBER YOU KNOW TO BE CORRECT FOR THIS OFFICE
to verify the information before wiring any money.
Failure to do so is at your own risk.
Be particularly wary of any request to change wire instructions
you have already received.

CONFIDENTIALITY NOTICE: This electronic message is intended to be
viewed only by the individual or entity to whom it is addressed.
It may contain information that is privileged, confidential and
exempt from disclosure under applicable law. Any dissemination,
distribution or copying of this communication is strictly prohibited
without our prior permission. If the reader of this message is not
the intended recipient, or the employee or agent responsible for
delivering the message to the intended recipient, or if you have
received this communication in error, please notify us immediately by
return e-mail and delete the original message and any copies of it
from your computer system.

For further information about Wilson, Elser, Moskowitz, Edelman &
Dicker LLP, please see our website at www.wilsonelser.com or refer to
any of our offices.

Thank you.

Exhibit 5

**Subject:** RE: Lazy S Ranch Properties, LLC v. Valero Terminaling and Distribution Company, et al. - Linde Services Inc.'s subpoena response

**Date:** Tuesday, October 14, 2025 at 5:57:32 PM Central Daylight Time

**From:** Herrin, Kimberly D.

**To:** Hall, David B., Charles Willing, David Page

**CC:** Matthew Johnson, Ben Barnes, Shannon Koelsch, Walsh, Andrew P., Marler, Lori, Herrin, Kimberly D.

**Attachments:** image001.jpg

All:

The iManage Share link has been updated to include Linde Services Inc.'s second production which follows the recent ruling on the Motion to Compel. These documents bear our bates sequence L 0088-0159.



Please let us know if you have any trouble accessing the materials. Thank you.

**Kimberly D. Herrin**
Paralegal
Wilson Elser Moskowitz Edelman & Dicker LLP
1500 Urban Center Drive Suite 450
Birmingham, AL 35242
205.709.8986 (Direct)
205.616.5851 (Cell)
205.709.8990 (Main)
205.709.8979 (Fax)
kim.herrin@wilsonelser.com

**WILSON** ELSER

**From:** Hall, David B. <David.Hall@wilsonelser.com>
**Sent:** Thursday, August 28, 2025 5:17 PM
**To:** cwilling@eenradvocates.com; David Page <dpage@eenradvocates.com>
**Cc:** Matthew Johnson <mjohnson@dowdbennett.com>; Ben Barnes <bbarnes@dowdbennett.com>; Shannon Koelsch <skoelsch@dowdbennett.com>; Hall, David B. <David.Hall@wilsonelser.com>; Walsh, Andrew P. <Andy.Walsh@wilsonelser.com>; Herrin, Kimberly D. <Kim.Herrin@wilsonelser.com>; Marler, Lori <Lori.Marler@wilsonelser.com>
**Subject:** Lazy S Ranch Properties, LLC v. Valero Terminaling and Distribution Company, et al. - Linde Services Inc.'s subpoena response

Please see Linde Services Inc.'s f/k/a Praxair Services, Inc. ("LSI") initial Confidential production in response to the six (6) Exhibit A to Plaintiff Lazy S Ranch Properties, LLC's Rule 45 subpoena *duces tecum*. All of the requested documents relate to the contract work LSI performed at the Wynnewood pipeline as part of LSI Job No. CG-05466, specifically including the initial tracer inoculation in early May 2025 and the subsequent SeeperTrace$^{TM}$ sledding on June 2, 2025. Please note that Job No. CG-05466 only covered the work performed in May 2025. The latter

SeeperTrace™ testing was performed pursuant to separately Job No. CG-06119, a copy of which is included in the Confidential production. Nevertheless, in the interest of cooperation, LSI's production includes documents responsive to both Job No. CG-05466 and Job No. CG-06119.

Also, Defendant provided a privilege log reflecting its withholding of certain June 2025 email correspondence. Defendant contends that the claimed attorney-client privilege extends to those records and advises that it asserts it as the holder of that privilege. In light of Defendant's invocation of privilege, we are withholding the production of these emails until Plaintiff and Defendant resolve this issue.

Also, LSI is objecting to Requests 3, 4 and 5, which broadly request production of documents regarding the SeeperTrace™ process, and the tracer chemical injected into the pipeline during the initial inoculation work. LSI's leak detection processes and tracer chemicals are highly sensitive and proprietary trade secrets that have been carefully guarded since the company was known as Tracer Research Corp. *See, e.g., Tracer Research Corp. v. Nat'l Env't Serv. Co.*, 843 F. Supp. 568 (D. Ariz. 1993). LSI objects to producing any of its trade secrets because their disclosure involves a serious risk of irreparable harm. It is not readily apparent that the requested trade secrets serve any evidentiary purpose, and we further believe sufficient publicly available information exists to verify the efficacy of LSI's leak detection work without needless disclosure of trade secrets. To the extent Plaintiff believes otherwise, we kindly request the opportunity to meet and confer to further discuss the asserted requests and LSI's objection thereto.

Below is a link to the documents produced as L 0001-0087. Please let us know if you have trouble accessing the materials.

https://www.imanageshare.com/f/mmspnrZwzz

**David B. Hall**
Attorney at Law
Wilson Elser Moskowitz Edelman & Dicker LLP
1500 Urban Center Drive Suite 450
Birmingham, AL 35242
205.709.8980 (Direct)
205.572.1462 (Cell)
205.709.8979 (Fax)
David.hall@wilsonelser.com



```
IMPORTANT NOTICE: Beware of Cyber Fraud.
You should NEVER wire money to any bank account that Wilson Elser
Moskowitz Edelman & Dicker LLP provides to you either in the body
of this or any email or in an attachment without first speaking
with the attorney in our office who is handling your transaction.
Further, DO NOT accept emailed wire instructions from anyone else
without voice verification. Even if an email looks like it has come
from this office or someone involved in your transaction,
CALL US FIRST AT A NUMBER YOU KNOW TO BE CORRECT FOR THIS OFFICE
```

to verify the information before wiring any money.
Failure to do so is at your own risk.
Be particularly wary of any request to change wire instructions
you have already received.

CONFIDENTIALITY NOTICE: This electronic message is intended to be
viewed only by the individual or entity to whom it is addressed.
It may contain information that is privileged, confidential and
exempt from disclosure under applicable law. Any dissemination,
distribution or copying of this communication is strictly prohibited
without our prior permission. If the reader of this message is not
the intended recipient, or the employee or agent responsible for
delivering the message to the intended recipient, or if you have
received this communication in error, please notify us immediately by
return e-mail and delete the original message and any copies of it
from your computer system.

For further information about Wilson, Elser, Moskowitz, Edelman &
Dicker LLP, please see our website at www.wilsonelser.com or refer to
any of our offices.

Thank you.

# Exhibit 6

**Subject:** Lazy S Ranch Properties, LLC v. Valero Terminaling and Distribution Company, et al. - Linde Services Inc.'s subpoena response

**Date:** Wednesday, November 19, 2025 at 5:37:18 PM Central Standard Time

**From:** Herrin, Kimberly D.

**To:** Charles Willing, David Page

**CC:** Matthew Johnson, Ben Barnes, Shannon Koelsch, Hall, David B., Walsh, Andrew P., Herrin, Kimberly D., Marler, Lori

**Attachments:** image001.jpg, L 0160 C1-C2 Tube 5241 10 min 1 CONFIDENTIAL.pdf, L 0161 C2-C3 Tube 4936 10 min 2 CONFIDENTIAL.pdf, L 0162 C3-C4 Tube 4884 10 min 3 CONFIDENTIAL.pdf, L 0163 C4-C5 Tube 4232 10 min 4 CONFIDENTIAL.pdf, L 0164 C5-C6 Tube 5153 10 min 5 CONFIDENTIAL.pdf, L 0165 C6-C7 Tube 4954 10 min 6 CONFIDENTIAL.pdf, L 0166 C7-C8 Tube 4942 10 min 7 CONFIDENTIAL.pdf, L 0167 Calibration Check Tube 4942 1 CONFIDENTIAL.pdf, L 0168 Calibration Check Tube 4942 CONFIDENTIAL.pdf, L 0169 Tube 4708 STD1 CONFIDENTIAL.pdf, L 0170 Tube 4708 STD2 CONFIDENTIAL.pdf, L 0171 Tube 4708 STD3 CONFIDENTIAL.pdf, L 0172 Tube 4708 Tube Burn 1 CONFIDENTIAL.pdf, L 0173 Tube 4708 Tube Burn 2 CONFIDENTIAL.pdf, L 0174 Tube 4947 AB 10min back of lab CONFIDENTIAL.pdf, L 0175 Tube Burn Tube 4942 1 CONFIDENTIAL.pdf

Please see attached additional testing records being produced by LSI as Confidential. They are also being loaded into the iManage Share link previously circulated. These documents bear our bates sequence L 0160-0175. We are happy to make copies in our office for use in the depositions if needed.

Link: 

**Kimberly D. Herrin**
Paralegal
Wilson Elser Moskowitz Edelman & Dicker LLP
1500 Urban Center Drive Suite 450
Birmingham, AL 35242
205.709.8986 (Direct)
205.616.5851 (Cell)
205.709.8990 (Main)
205.709.8979 (Fax)
kim.herrin@wilsonelser.com

**WILSON** ELSER

IMPORTANT NOTICE: Beware of Cyber Fraud.
You should NEVER wire money to any bank account that Wilson Elser
Moskowitz Edelman & Dicker LLP provides to you either in the body
of this or any email or in an attachment without first speaking
with the attorney in our office who is handling your transaction.
Further, DO NOT accept emailed wire instructions from anyone else
without voice verification. Even if an email looks like it has come
from this office or someone involved in your transaction,
CALL US FIRST AT A NUMBER YOU KNOW TO BE CORRECT FOR THIS OFFICE
to verify the information before wiring any money.
Failure to do so is at your own risk.
Be particularly wary of any request to change wire instructions
you have already received.

CONFIDENTIALITY NOTICE: This electronic message is intended to be
viewed only by the individual or entity to whom it is addressed.
It may contain information that is privileged, confidential and
exempt from disclosure under applicable law. Any dissemination,
distribution or copying of this communication is strictly prohibited
without our prior permission. If the reader of this message is not
the intended recipient, or the employee or agent responsible for
delivering the message to the intended recipient, or if you have
received this communication in error, please notify us immediately by
return e-mail and delete the original message and any copies of it
from your computer system.

For further information about Wilson, Elser, Moskowitz, Edelman &
Dicker LLP, please see our website at www.wilsonelser.com or refer to
any of our offices.

Thank you.

Exhibit 7

Environmental Energy & Natural
Resources Advocates, PLLC
eenradvocates.com

November 25, 2025

**VIA EMAIL**

David B. Hall
Wilson, Elser, et al.
1500 Urban Center Drive, Suite 450
Birmingham, AL 35242
david.hall@wilsonelser.com

**RE:    Follow-up Letter Regarding Documents Not Produced**

Dear David,

This letter is sent to identify for you the documents that we are requesting that Linde produce relating to the TracerSeeper job Linde performed on the Valero Ardmore to Wynnewood pipeline in April-June 2025 ("Linde/Valero Job"):

1. All Linde/Valero Job protocol(s) and/or standard operating procedure(s) that are applicable to the performance of the Linde/Valero Job.
2. All information recorded by the sled-sampler concerning the sampling – analysis performed on the Lazy S Ranch. This would include all notes and records made of the sled sampling, or the gas chromatography, for the Linde/Valero Job.
3. All documentation of the training received by the Linde employees who performed the Linde/Valero Job.
4. The gas chromatograph documents that were produced on Wednesday November 19th as L0160 - L0175 have a gas chromatogram for only 7 samples. Sample 8 was not produced. Please produce the chromatogram for sample 8.
5. Not all of the handwritten and typed notes for the inoculations were produced. Please produce Mario Cervantes notes.

Sincerely,

David P. Page

**Subject:** RE: Linde Supplemental Production

**Date:** Thursday, December 11, 2025 at 11:44:51 AM Central Standard Time

**From:** Hall, David B.

**To:** David Page

**CC:** Charles Willing, Matthew Johnson, Jamie Shilling, Jeffery Carmichael, Marler, Lori, Herrin, Kimberly D., Walsh, Andrew P.

**Attachments:** L 0176-0192 LSI SOP-5001 2023 HIGHLY CONFIDENTIAL.pdf, L 0193-0203 LSI SOP-5002 2023 HIGHLY CONFIDENTIAL.pdf, L 0204-0216 LSI SOP-5009 2023 HIGHLY CONFIDENTIAL.pdf, L 0217-0243 LSI SOP-5010 2023 HIGHLY CONFIDENTIAL.pdf

# Exhibit 8

David:

Regarding your topics:

#1.  We are providing the SOPs under a designation of "Highly Confidential".  Linde is producing these things despite that it considers them trade secrets, but it is not waiving its objection to the production of other trade secrets, include those previously referenced regarding Tracer E.  My client will take any violation of the court's protective order, inadvertent or otherwise, seriously and seek all available remedies, including but not limited to, sanctions and money damages, available to it. The SOPs are attached (SOP--5001 5002, 5009, and 5010 all 2023).

#2.  After a diligent search (and re-search at your request), my client has not been able to locate these records.

#3.  This topic was not covered by the subpoena.  If you believe otherwise, please advise and provide the basis.

#4.  C8-C9 was mislabeled on the PDF.  The sample was the Air Blank.  It was supplied as Tube 4947 AB 10min back of lab.

#5.  As I informed you at the deposition, you have Mario Cervantes' notes.  They are bates numbers L 0009-0011.

I am available to for a meet and confer call between 2 and 3 CT if you believe it is necessary.

David B. Hall
Attorney at Law
Wilson Elser Moskowitz Edelman & Dicker LLP
1500 Urban Center Drive Suite 450
Birmingham, AL 35242
205.709.8980 (Direct)
205.572.1462 (Cell)
205.709.8990 (Main)
205.709.8979 (Fax)
david.hall@wilsonelser.com

-----Original Message-----
From: David Page <dpage@eenradvocates.com>
Sent: Wednesday, December 10, 2025 5:06 PM
To: Hall, David B. <David.Hall@wilsonelser.com>
Cc: Charles Willing <cwilling@eenradvocates.com>; Matthew Johnson
<mjohnson@dowdbennett.com>; Jamie Shilling <JShilling@eenradvocates.com>; Jeffery
Carmichael <jcarmichael@morrislaing.com>
Subject: Linde Supplemental Production

Hi David

Please confirm by noon tomorrow whether or or not Linde will supplement its production. For
any documents that Linde refuses to produce, advise when a meet and confer can occur
tomorrow afternoon.

Please know that we are prepared to file a motion to compel if there is any failure to produce
these documents forthwith.

Thanks, David

Sent from my iPhone

IMPORTANT NOTICE: Beware of Cyber Fraud.
You should NEVER wire money to any bank account that Wilson Elser
Moskowitz Edelman & Dicker LLP provides to you either in the body
of this or any email or in an attachment without first speaking
with the attorney in our office who is handling your transaction.
Further, DO NOT accept emailed wire instructions from anyone else
without voice verification. Even if an email looks like it has come
from this office or someone involved in your transaction,
CALL US FIRST AT A NUMBER YOU KNOW TO BE CORRECT FOR THIS OFFICE
to verify the information before wiring any money.
Failure to do so is at your own risk.
Be particularly wary of any request to change wire instructions
you have already received.

CONFIDENTIALITY NOTICE: This electronic message is intended to be
viewed only by the individual or entity to whom it is addressed.
It may contain information that is privileged, confidential and
exempt from disclosure under applicable law. Any dissemination,
distribution or copying of this communication is strictly prohibited
without our prior permission. If the reader of this message is not
the intended recipient, or the employee or agent responsible for
delivering the message to the intended recipient, or if you have
received this communication in error, please notify us immediately by
return e-mail and delete the original message and any copies of it
from your computer system.

For further information about Wilson, Elser, Moskowitz, Edelman & Dicker LLP, please see our website at www.wilsonelser.com or refer to any of our offices.

Thank you.

| | | |
|---|---|---|
| **Subject:** | RE: Message from CHARLES WILLING (+19188101692) | **Exhibit 9** |
| **Date:** | Friday, December 12, 2025 at 4:33:34 PM Central Standard Time | |
| **From:** | Hall, David B. | |
| **To:** | Charles Willing | |
| **CC:** | Marler, Lori, Herrin, Kimberly D., Walsh, Andrew P., David Page | |
| **Category:** | Smokeball | |

**Attachments:** image001.png, All Crew Seeper Training Process #6.pdf, Kel Linter GC Seeper Training.pdf

I literally had just gotten off the phone with the client 30 minutes ago. My call did not go forward until this afternoon.

The motion you threaten regarding the so-called "training" records will be spurious. My client will certainly consider respond accordingly and seeking all allowable relief.

In the alternative, we can voluntarily (we are under no legal obligation since the subpoena does not call for "training" records) provide you with Training Qualification Checklists, which are attached.

David B. Hall
Attorney at Law
Wilson Elser Moskowitz Edelman & Dicker LLP
1500 Urban Center Drive Suite 450
Birmingham, AL 35242
205.709.8980 (Direct)
205.572.1462 (Cell)
205.709.8990 (Main)
205.709.8979 (Fax)
david.hall@wilsonelser.com



**From:** Charles Willing <cwilling@eenradvocates.com>
**Sent:** Friday, December 12, 2025 4:23 PM
**To:** Hall, David B. <David.Hall@wilsonelser.com>
**Cc:** Marler, Lori <Lori.Marler@wilsonelser.com>; Herrin, Kimberly D. <Kim.Herrin@wilsonelser.com>; Walsh, Andrew P. <Andy.Walsh@wilsonelser.com>; David Page <dpage@eenradvocates.com>
**Subject:** RE: Message from CHARLES WILLING (+19188101692)

EXTERNAL EMAIL - This email originated from outside the organization.

David H.,

Since we have not heard from you, we assume that your client will not be producing the materials.

We will proceed with a motion to compel.

Best regards,
Chuck Willing

 **Charles R. Willing** ǀ **Member** ǀ **EENR Advocates**
1921 S Boston Ave. ǀ Tulsa, Oklahoma  74119
Phone: 918.764.8984 ǀ**cwilling@eenradvocates.com**

This communication may be protected by the attorney-client privilege and may contain confidential information. If it has been sent to you in error, please reply to the sender that you received it and then delete the message. Any dissemination, distribution, copying or reproduction of this message other than by its intended recipient is strictly prohibited.

-----Original Message-----
From: Hall, David B. <David.Hall@wilsonelser.com>
Sent: Thursday, December 11, 2025 3:10 PM
To: Charles Willing <cwilling@eenradvocates.com>
Cc: Marler, Lori <Lori.Marler@wilsonelser.com>; Herrin, Kimberly D. <Kim.Herrin@wilsonelser.com>; Walsh, Andrew P. <Andy.Walsh@wilsonelser.com>
Subject: FW: Message from CHARLES WILLING (+19188101692)

I have a call with my client at 9 tomorrow morning.  I will discuss this with them and get back to you.

David B. Hall
Attorney at Law
Wilson Elser Moskowitz Edelman & Dicker LLP
1500 Urban Center Drive Suite 450
Birmingham, AL 35242
205.709.8980 (Direct)
205.572.1462 (Cell)
205.709.8990 (Main)
205.709.8979 (Fax)
david.hall@wilsonelser.com

-----Original Message-----
From: Cisco Unity Connection Messaging System <unityconnection@myvoicemail.wilsonelser.com>

Sent: Thursday, December 11, 2025 3:01 PM
To: David Hall <hallda@myvoicemail.wilsonelser.com>
Subject: Message from CHARLES WILLING (+19188101692)

Hi David, this is the Chuck Williams Helsa again, our expert believes he needs the records as part of his analysis and so we're going to be filing a motion to compel, but I wanted to call you back and one to let you know that and two, you know, if you could, check with client and maybe take one last stab at it, let us know, you know, by the end of the day whether they would produce them or not, but, not, not hearing that they will produce it then we will be filing a motion to compel. Chuck Willing 918-810-1692. Thank you, bye.

IMPORTANT NOTICE: Beware of Cyber Fraud.
You should NEVER wire money to any bank account that Wilson Elser Moskowitz Edelman & Dicker LLP provides to you either in the body of this or any email or in an attachment without first speaking with the attorney in our office who is handling your transaction.
Further, DO NOT accept emailed wire instructions from anyone else without voice verification. Even if an email looks like it has come from this office or someone involved in your transaction, CALL US FIRST AT A NUMBER YOU KNOW TO BE CORRECT FOR THIS OFFICE to verify the information before wiring any money.
Failure to do so is at your own risk.
Be particularly wary of any request to change wire instructions you have already received.

CONFIDENTIALITY NOTICE: This electronic message is intended to be viewed only by the individual or entity to whom it is addressed.
It may contain information that is privileged, confidential and exempt from disclosure under applicable law. Any dissemination, distribution or copying of this communication is strictly prohibited without our prior permission. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, or if you have received this communication in error, please notify us immediately by return e-mail and delete the original message and any copies of it from your computer system.

For further information about Wilson, Elser, Moskowitz, Edelman & Dicker LLP, please see our website at www.wilsonelser.com or refer to any of our offices.

Thank you.

IMPORTANT NOTICE: Beware of Cyber Fraud.
You should NEVER wire money to any bank account that Wilson Elser Moskowitz Edelman & Dicker LLP provides to you either in the body of this or any email or in an attachment without first speaking with the attorney in our office who is handling your transaction. Further, DO NOT accept emailed wire instructions from anyone else without voice verification. Even if an email looks like it has come from this office or someone involved in your transaction, CALL US FIRST AT A NUMBER YOU KNOW TO BE CORRECT FOR THIS OFFICE to verify the information before wiring any money. Failure to do so is at your own risk. Be particularly wary of any request to change wire instructions

you have already received.

CONFIDENTIALITY NOTICE: This electronic message is intended to be viewed only by the individual or entity to whom it is addressed. It may contain information that is privileged, confidential and exempt from disclosure under applicable law. Any dissemination, distribution or copying of this communication is strictly prohibited without our prior permission. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, or if you have received this communication in error, please notify us immediately by return e-mail and delete the original message and any copies of it from your computer system.

For further information about Wilson, Elser, Moskowitz, Edelman & Dicker LLP, please see our website at www.wilsonelser.com or refer to any of our offices.

Thank you.

Exhibit 10

```
 1        IN THE UNITED STATES DISTRICT COURT, FOR THE

 2              EASTERN DISTRICT OF OKLAHOMA

 3

 4   CIVIL ACTION NO.:  19-CV-425-JWB

 5

 6   LAZY S RANCH PROPERTIES, LLC,

 7              Plaintiff,

 8   vs.

 9   VALERO TERMINALING AND

10   DISTRIBUTION COMPANY; VALERO

11   PARTNERS OPERATING CO., LLC;

12   and VALERO PARTNERS WYNNEWOOD, LLC,

13              Defendants.

14

15

16                   DEPOSITION

17                      OF

18                 RAY CIMIJOTTI

19              November 20, 2025

20

21   REPORTED BY:

22        Ellie Pickett,

23        Certified Court Reporter
```

Page 1

```
 1    flag with a letter and a number typically, and
 2    then it will be say like R1 to R2.
 3         Q.    Okay.  And what is done with it
 4    after you put the flag in the ground?  Is there
 5    any information collected from it?  Is it left
 6    there for a year?  I'm just trying to
 7    understand the guy's out there.  He puts the
 8    beginning, I guess, and the end?
 9         A.    Yep.
10         Q.    What's done after that?
11         A.    Typically the cows will eat them.
12    But they just stay there until -- sometimes the
13    customer will take them out.  But we don't do
14    anything with them.
15         Q.    Okay.  Now, you -- we are going
16    to -- we are going to get to inoculation, I
17    promise you that, but for the job of sampling
18    and the job of analysis, gas chromatograph
19    analysis, what training was provided?
20         A.    On the job.
21         Q.    On the job?
22         A.    (Witness nods head affirmatively.)
23         Q.    So --
```

Page 45

```
 1          A.    We do some training prior in the
 2    lab.  We do like a short -- we have a chemist
 3    in our lab, and he gives us like a couple of
 4    days of training on how to operate the GC and
 5    that.  But most of our training is done on the
 6    job by other technicians.
 7          Q.    Including the GC operations?
 8          A.    It's both.
 9          Q.    It's both, okay.  What training
10    did you receive?
11          A.    Both.
12          Q.    Okay.  And how many days do you
13    say you're in the lab with the chemist?
14          A.    Since I've been working here?
15          Q.    No, for the training.
16          A.    For the training, I don't remember
17    exactly.
18          Q.    A week?
19          A.    A couple of days.
20          Q.    A couple of days, okay.  That
21    gives us a sense.
22                What about GC training out in the
23    field on the job, how do you describe that?
```

Veritext Legal Solutions
800-336-4000

```
 1         A.    So when I started, if we had one
 2    of these types of jobs, a pipeline job, they
 3    would basically send me out there just as a
 4    trainee.  So I would work in the lab with the
 5    experienced technician, and they would take me
 6    through the whole process.  And we would do
 7    that as many times as we needed to.
 8         Q.    Okay.  And who makes the decision
 9    you're trained enough to do it on your own?
10         A.    It's -- typically it's done
11    between my boss, Alan Harris, and the
12    technician that's training.
13         Q.    Who trained you?  Who was the
14    technician that trained you?
15         A.    I had multiple.
16         Q.    Okay.  Are there any records kept
17    of the training?
18         A.    I don't know.
19         Q.    Okay.  What about training for
20    sledding?  Is there training for sledding
21    provided?
22         A.    Yes.
23         Q.    Is it in a lab, or is it out in
```

Veritext Legal Solutions
800-336-4000

```
 1   the field?
 2           A.    Out in the field.
 3           Q.    Okay.  Are there any records kept
 4   of that?
 5           A.    I don't know.
 6           Q.    How many days of sledding training
 7   did you receive?
 8           A.    I don't remember.
 9           Q.    And how many times have you
10   actually operated the sled for sampling for
11   Linde?
12           A.    Over a hundred.
13           Q.    On a pipeline?
14           A.    Yes.
15           Q.    Okay.  Is the terrain important,
16   that is, the -- well, the terrain important on
17   sampling?
18           A.    It's important in the sense that
19   like -- like important how, I guess?
20           Q.    How do you define terrain,
21   Mr. Cimijotti?  I probably mispronounced your
22   name.
23           A.    That's okay.
```

Veritext Legal Solutions
800-336-4000

```
 1        A.    Yes.

 2        Q.    But that's not saying this shows

 3   Tracer E has been released, like circling some

 4   part on a GC and saying this shows X?

 5        A.    No.   I mean, you'd have the data,

 6   but it wouldn't say that specifically, no.

 7        Q.    Have you ever worked in a

 8   certified lab?

 9        A.    No.   Well, I mean, I've worked in

10   our lab in Tucson with my training, but I've

11   not worked in any other kind of lab.

12        Q.    Have you done any analysis in the

13   Tucson lab?

14        A.    Yes.

15        Q.    And are those certified results?

16        A.    It's training, so no.

17        Q.    Do you know whether or not your

18   lab is certified by the EPA?

19        A.    I don't know.

20        Q.    The state of Arizona?

21        A.    I don't know.

22        Q.    State of Texas?

23        A.    I don't know.
```

Veritext Legal Solutions
800-336-4000

```
1        Q.    Who's Chris Toda?

2        A.    He's one of our technicians.

3        Q.    He's another technician like you?

4        A.    Yes.

5        Q.    Is he your supervisor?

6        A.    No.

7        Q.    He's just another technician?

8        A.    He is another technician, yes.

9        Q.    Okay.  Was he in charge of this

10  Lazy S or this Ardmore-Wynnewood pipeline job?

11       A.    No.

12       Q.    Who was?

13       A.    Initially, I was.

14       Q.    Because you're out there doing the

15  inoculation?

16       A.    I was the senior technician on

17  site, yes.

18       Q.    Okay.  And then you left?

19       A.    Yes.

20       Q.    And then who was senior technician

21  after that?

22       A.    I don't know.  I wasn't there.

23       Q.    Did you ever see Linde's report to
```

1    Valero concerning the work they did on this
2    pipeline?
3            A.    No.
4            Q.    Do you typically comment, write
5    comments, or assist in writing reports for
6    Linde on these seeper tracker tests?
7            A.    No.
8            Q.    Do you know whether or not Linde
9    issues reports to the client?
10           A.    I have never issued one.  I don't
11   know.
12           Q.    So could there be somebody else
13   that could be issuing reports to clients that
14   you're unaware of?
15           A.    Yes.
16           Q.    Okay.  When you first sat down and
17   I asked you whether or not there was any
18   sampling, you said no because there was a
19   successful test.  Who told you it was a
20   successful hydrotest?
21           A.    The hydrotest company would tell
22   us typically.
23           Q.    They told you?

Page 166

```
 1          A.    I don't remember.

 2          Q.    Is that information that you

 3   consider when you're doing your sampling and

 4   analysis?

 5          A.    Whether the line passed?

 6          Q.    Yes, by the hydrotest company.

 7          A.    Yes.  Typically we don't do any

 8   sampling if it passes.

 9          Q.    Okay.  Do you remember ever

10   sampling and doing a GC analysis on any

11   pipeline that has passed the hydrotest

12   according to the hydrotest company?

13          A.    Yes.

14          Q.    Which one?

15          A.    I don't remember.

16          Q.    Why was that done?  Do you

17   remember?

18          A.    Client asked us to.

19          Q.    To continue to just do it anyway?

20          A.    Yes.

21          Q.    Okay.  How many times has that

22   happened?

23          A.    In my twelve years, probably five
```

Page 167

```
 1   or six times maybe.
 2              (Whereupon, Linde Exhibit 4 was
 3              marked for identification
 4              and a copy of same is attached
 5              hereto.)
 6        Q.   Okay.  Let me hand you what I've
 7   marked as Linde Number 4.
 8        A.   Okay.
 9        Q.   And tell me whether you've ever
10   seen that before.
11        A.   No.
12        Q.   Okay.  You mentioned when we
13   were -- before lunch that there was some kind
14   of a certification done years ago for Linde on
15   how to know how long you can wait before you do
16   your test and that kind of stuff.  Do you
17   remember that testimony?
18        A.   I don't know that I said that
19   there was for sure.  I mean, I don't know if
20   there was.
21        Q.   Well, how do you know there's a
22   thirty-day limit?
23        A.   That's our SOP.
```

```
1          Q.    It's on your SOPs?
2          A.    Yes.
3          Q.    And those are written down
4     somewhere?
5          A.    Yes.
6          Q.    Does your SOP also tell you that
7     you should go out and verify on the test site
8     whether site conditions are suitable for
9     SeeperTrace?
10         A.    To verify if it is?
11         Q.    Yeah.
12         A.    I guess I don't exactly know what
13    you mean.  Can you be more specific about it?
14         Q.    Well, it's sometimes called a
15    spike test in an environmental analysis where
16    they go out and actually place some material
17    that they are looking for --
18         A.    Okay.
19         Q.    -- in the environment and then see
20    if they can collect it the way they would
21    collect SeeperTrace out in the field.
22         A.    Yes.
23         Q.    Okay.  And is that in your SOPs?
```

Veritext Legal Solutions
800-336-4000

```
1          A.    I don't know.

2          Q.    You've never done that?

3          A.    On a seeper job, no.

4          Q.    Just on the commercial jobs,

5    right?

6          A.    Yes.

7          Q.    Have you ever heard of someone by

8    the name of Kendall Wilcox?

9          A.    I've heard the name.

10         Q.    Do you recognize how you may know

11   his name?

12         A.    No.

13         Q.    Turn to page -- it's kind of hard

14   to see because I think the Bates numbers are

15   over the top of it, but I think it's L 0006.

16         A.    Okay.

17         Q.    Okay.  Yeah, that's it.  Have you

18   ever -- it's a three-page document.  At the end

19   there is a guy by the name of H. Kendall

20   Wilcox, Ph.D., president, that signed it.  Have

21   you ever seen that document before?

22         A.    No.

23         Q.    Was it ever given to you as part
```

Veritext Legal Solutions
800-336-4000

```
1    of your training?

2          A.    No.

3          Q.    All right.  Is it in your protocol

4    book?

5          A.    This paper?

6          Q.    Well, the information on it.

7          A.    I mean, I recognize some of the

8    information, but no, not that I recall.

9          Q.    Okay.  So on this particular job,

10   the one for Valero, you did the inoculation?

11         A.    Correct.

12         Q.    How long were you out there

13   inoculating?

14         A.    Total, I'm not really sure.

15         Q.    Do you recall anything about the

16   inoculation?

17         A.    Yes.

18         Q.    What do you recall?

19         A.    I recall that it was raining and

20   muddy, and I remember we had to split up to

21   do -- me and the other technician had to split

22   up to do a booster inoculation.

23         Q.    Anything else?
```

Veritext Legal Solutions
800-336-4000

```
 1        A.    No.  Nothing in particular.

 2        Q.    Who is the other technician?

 3        A.    His name was Mario Cervantes.

 4        Q.    Does he still work for the

 5   company?

 6        A.    Yes.

 7        Q.    Okay.  Does he have as much

 8   experience as you do?

 9        A.    No.

10        Q.    How much experience does he have?

11        A.    I think he's been there for about

12   five years, five or six years maybe.

13        Q.    And how about Mr. Chris Toda, how

14   much experience does he have?

15        A.    I believe probably around a total

16   of eight years maybe.

17        Q.    Do you see on Exhibit Number 4

18   that he signed this document on the third page?

19        A.    I did see that up there, yes.

20        Q.    Have you ever seen that before?

21        A.    No.

22        Q.    Do you know that he signs reports?

23        A.    No.
```

Veritext Legal Solutions
800-336-4000

Exhibit 11

```
 1      IN THE UNITED STATES DISTRICT COURT, FOR THE
 2              EASTERN DISTRICT OF OKLAHOMA
 3
 4    CIVIL ACTION NO.:  19-CV-425-JWB
 5
 6    LAZY S RANCH PROPERTIES, LLC,
 7                  Plaintiff,
 8    vs.
 9    VALERO TERMINALING AND
10    DISTRIBUTION COMPANY; VALERO
11    PARTNERS OPERATING CO., LLC;
12    and VALERO PARTNERS WYNNEWOOD, LLC,
13                  Defendants.
14
15
16                  DEPOSITION
17                      OF
18                KEL LINTNER
19             November 20, 2025
20
21    REPORTED BY:
22          Ellie Pickett,
23          Certified Court Reporter
```

Veritext Legal Solutions
800-336-4000

```
 1          A.      Forty-nine.

 2          Q.      Forty-nine.  Okay.  And can you

 3   describe for us your education following high

 4   school?

 5          A.      High school was it.

 6          Q.      Okay.  Have you taken any trade

 7   courses or --

 8          A.      No.

 9          Q.      -- anything like that?

10          A.      No.

11          Q.      Have you taken any chemistry

12   courses?

13          A.      No.

14          Q.      Have you taken any lab technician

15   courses?

16          A.      No.

17          Q.      Have you taken any courses on how

18   to sample environmental areas?

19          A.      Through work, no.

20          Q.      Okay.  Other than during work,

21   have you taken classes on sampling?

22          A.      No.

23          Q.      Okay.  So I was trying to
```

```
 1    understand what you meant by through work.
 2          A.    Other than work, I'm sorry.
 3          Q.    Other than work?
 4          A.    Yeah.  No, I have not taken any
 5    formal training on sampling.
 6          Q.    Okay.  So when did you go to work
 7    for Linde?
 8          A.    Well, I went to work starting with
 9    Praxair back in 2009.
10          Q.    So you've been with them sixteen
11    years?
12          A.    Almost sixteen.
13          Q.    And that would make you about
14    thirty-three when you went to work there,
15    correct?
16          A.    Correct.
17          Q.    So what did you do before that?
18          A.    I worked for Halliburton.
19          Q.    What did you do for Halliburton?
20          A.    I worked on a fracturing crew.
21          Q.    Frac crew for Halliburton?
22          A.    Yeah.
23          Q.    Okay.  And how long did you do
```

Veritext Legal Solutions
800-336-4000

```
 1          A.    Yes.
 2          Q.    Okay.  And which of those three
 3   jobs have you done the most?
 4          A.    I don't know the answer to that.
 5   I've done -- it's pretty even with those.  It
 6   all depends on the job and who I'm working
 7   with.
 8          Q.    What do you mean by depends on the
 9   job or who I'm working with?
10          A.    There's a lot of times we'll flip
11   a coin like who wants to run the lab.  If
12   somebody is -- I mean, a seasoned technician
13   will, you know, hey, do you want to run the lab
14   today or do you want to sled today, we'll flip
15   a coin or we'll debate it.
16          Q.    Okay.  What training did you have
17   to run the lab or do the analytical work?
18          A.    On-the-job training.
19          Q.    On the job?
20          A.    Yeah.
21          Q.    Do you remember who trained you?
22          A.    Wes Pierce, Brian Cloniger, Larry
23   Shinmeir, Brian Quinley, and that's about it.
```

Page 14

```
 1          Q.     How much training did you receive?

 2          A.     Quite extensive training.

 3          Q.     Okay.  How many days?

 4          A.     I would say probably months of

 5    training.

 6          Q.     Months of training?

 7          A.     Yeah.

 8          Q.     So you were in the lab with

 9    another person looking at the gas chromatograph

10    for months?

11          A.     Yes.

12          Q.     Until they let you do it on your

13    own?

14          A.     Yes.

15          Q.     What chemicals were you looking

16    for when you ran the gas chromatograph?

17          A.     We were looking for our tracer

18    compound.

19          Q.     Which one?

20          A.     Depending on the job.  We have

21    different tracers.

22          Q.     Okay.  How many pipelines have you

23    worked on?
```

Veritext Legal Solutions
800-336-4000

```
 1          A.    I don't know.  Dozens.

 2          Q.    Okay.  And is there one tracer

 3   that's used for a pipeline versus other

 4   operations?

 5          A.    We have three different tracers

 6   that we can use for a pipeline.

 7          Q.    Which are?

 8          A.    E, R, and G.

 9          Q.    Okay.  What about sledding, you

10   trained -- were you trained on sledding?

11          A.    Yes.

12          Q.    Okay.  And who trained you for

13   that?

14          A.    The same, the same people.

15          Q.    And how long were you trained?

16          A.    Sledding is a little different.

17   Probably weeks.

18          Q.    A couple of weeks?

19          A.    Yeah.

20          Q.    Okay.  And what about for

21   inoculations?

22          A.    Trained by the same people.

23   Weeks.
```

Page 16

```
1          Q.   Okay.  So the most training was
2    required with the analytical work?
3          A.   Yes.
4          Q.   So for the job that was last
5    spring and summer on the Valero pipeline, you
6    performed what role?
7          A.   I was a lab technician.
8          Q.   Okay.  So you were out on site?
9          A.   Yeah.
10         Q.   Did you ever walk the line?
11         A.   No.
12         Q.   Did you see where the line ran?
13         A.   It ran south of my location.
14         Q.   Okay.  Did you walk along the line
15   location?
16         A.   No.
17         Q.   Was it marked?
18         A.   I don't know that.
19         Q.   Who was the sledding person on
20   this job?
21         A.   It would be my coworker, Colt
22   Norton.
23         Q.   Did you talk about the sledding
```

Page 17

```
 1   job on this line with Colt?
 2          A.      We had a prejob discussion.
 3          Q.      What did you discuss?
 4          A.      You know, look out for hazards,
 5   take your time, drink plenty of fluid.  I
 6   remember it was hot that day.
 7          Q.      How long was the line sledded?
 8          A.      About four hours.
 9          Q.      Four hours total time?
10          A.      I think, yes.
11          Q.      Including the analytical time?
12          A.      No.  That -- no.  It was about
13   five hours total with the analytical, five or
14   six hours total with me running the samples.
15          Q.      And who ran the samples?
16          A.      I analyzed them.
17          Q.      And who -- was there somebody that
18   got the samples from the sledder to the
19   analytical lab?
20          A.      Yes.
21          Q.      Who was that?
22          A.      It was a Valero employee.
23          Q.      And was he trained?
```

Veritext Legal Solutions
800-336-4000

```
 1          A.    No.

 2          Q.    Did Mr. Norton ever explain to you

 3     what the terrain was like out there on the --

 4     on this particular line?

 5          A.    Not that I remember.

 6          Q.    Do you remember what property this

 7     line was on?

 8          A.    No.  Not that I recall, no.

 9          Q.    Does the Lazy S Ranch ring a bell?

10          A.    No.  Not at that time, no.

11          Q.    Okay.  Do you know whether or not

12     there's any steep areas on the pipeline?

13          A.    No.

14          Q.    How many samples were analyzed?

15          A.    I don't remember.

16          Q.    Okay.  Let's talk a little bit

17     about sledding and analysis.  So you didn't

18     traverse the pipeline, correct?

19          A.    That's correct.

20          Q.    Do you know how many times Colt

21     walked the pipeline?

22          A.    He did one initial walk.

23          Q.    Okay.  And doesn't your protocol
```

Page 19

Exhibit 12

```
 1          IN THE UNITED STATES DISTRICT COURT, FOR THE

 2                EASTERN DISTRICT OF OKLAHOMA

 3

 4     CIVIL ACTION NO.:  19-CV-425-JWB

 5

 6     LAZY S RANCH PROPERTIES, LLC,

 7               Plaintiff,

 8     vs.

 9     VALERO TERMINALING AND

10     DISTRIBUTION COMPANY; VALERO

11     PARTNERS OPERATING CO., LLC;

12     and VALERO PARTNERS WYNNEWOOD, LLC,

13               Defendants.

14

15

16                    DEPOSITION

17                       OF

18                   CHRIS TODA

19                November 21, 2025

20

21     REPORTED BY:

22          Ellie Pickett,

23          Certified Court Reporter
```

Page 1

```
 1          A.    Yes.
 2          Q.    Okay.  And you were hired as an
 3    AIMS tech?
 4          A.    That's the nomenclature they use
 5    for our technicians.
 6          Q.    Who hired you?
 7          A.    Alan Harris hired me.
 8          Q.    Okay.  Is he your supervisor?
 9          A.    He is.
10          Q.    Was he the whole time?
11          A.    Yes.
12          Q.    Okay.  And what did you do?
13          A.    Can you clarify that?
14          Q.    Well, when you started work, what
15    did you do?
16          A.    We started with training, and once
17    we're competent, we start with small jobs.
18          Q.    Okay.  What type of training did
19    you receive?  Did they have a classroom?  Books
20    and texts?  On the job?  Which was it?
21          A.    Linde starts with what they call
22    is a NESO training, N-E-S-O.  That's a -- just
23    a standard company training that pretty much
```

Veritext Legal Solutions
800-336-4000

1     covers all the bases, even CPR, safety, you
2     know, being around nitrogen.
3             Q.    So is NESO training specific to
4     the AIMS tech work you were doing?
5             A.    It is not, no.  It is specific to
6     Praxair Services.
7             Q.    Okay.  Kind of an employee
8     onboarding, so to speak?
9             A.    Yes.
10            Q.    So what training have you had as a
11    tech for the seeper tracer gas?
12            A.    Once the NESO is complete, I flew
13    to Tucson and we had a main training for our
14    tasks that we do as an AIMS tech.
15            Q.    All right.  And is Tucson a
16    particular location for Praxair?  Or I guess
17    now it's called Linde?
18            A.    Yes, it is.
19            Q.    Does it have a particular purpose?
20            A.    It's the same location where the
21    inventor of the technology started and where
22    Praxair bought the company that it was
23    originally.

Veritext Legal Solutions
800-336-4000

```
 1          Q.    And what technology is that?

 2          A.    It was Tracer Research was the

 3     name of the company.

 4          Q.    Okay.  And what kind of technology

 5     was it?

 6          A.    It was using a tracer gas and a

 7     gas chromatograph to be able to find a leak in

 8     tanks and pipelines.

 9          Q.    Do you remember the name of the

10     person who developed this technology?

11          A.    I believe his name was Glen, but I

12     can't remember his last name now.

13          Q.    Did you ever meet him?

14          A.    I did meet him.  He's the guy who

15     owns the building now.

16          Q.    Okay.  His name is Glen?

17          A.    Glen, yes.

18                (Whereupon, Linde Exhibit

19                4, having been previously marked

20                for identification, was referenced

21                in this deposition.)

22          Q.    Would you pull out Exhibit Number

23     4.  It should be in front of you.  Hopefully
```

Page 19

```
1      they are in numerical order.
2            A.    (Witness complies.)
3            Q.    So that's a Linde document.  I
4      believe you actually executed this document,
5      did you not?
6            A.    I did.
7            Q.    Okay.  Is there a reference to the
8      person who developed this technology in this
9      document?
10           A.    I do not remember.
11           Q.    It's hard to read, but if you
12     would look on page I think it's 0006 towards
13     the end, it says nonvolumetric pipeline
14     tightness testing method?
15           A.    I see that.
16           Q.    Have you ever seen that before?
17           A.    Yes.
18           Q.    Okay.  And does this describe the
19     methodology that's used for seeper tracer work?
20           A.    Yes.  Yes.
21           Q.    On the second or third page, the
22     name is Kendall Wilcox.  Is that the person
23     that you're referring to that you met that's
```

Veritext Legal Solutions
800-336-4000

```
 1      the developer of the technology?

 2            A.    It is not.

 3            Q.    Do you know who Kendall Wilcox is?

 4            A.    I don't personally know who he is.

 5            Q.    Okay.  Do you know what his role

 6      was with respect to the seeper tracer

 7      technology that's used by Linde?

 8            A.    What I understand, it's a

 9      third-party certification which verified our

10      technology.

11            Q.    Have you studied this document,

12      this third-party certification?

13            A.    I have not studied it in detail.

14            Q.    When you do work on seeper tracer,

15      do you follow the requirements of the

16      third-party certification?

17            A.    I do not follow the -- the

18      third-party certification, no.

19            Q.    Does it have any effect on the

20      result?

21            A.    It does not.

22            Q.    How do you know that?

23            A.    Because I was not trained, trained
```

Veritext Legal Solutions
800-336-4000

1    on that based on that document.  I was only
2    trained on what they gave me in the official
3    training.
4            Q.    Oh, so it wasn't what you were
5    trained on, but you don't know whether or not
6    your methodology is effective without having a
7    third party investigate it, correct?
8                    MR. JOHNSON:  Objection to form.
9                    MR. HALL:  Object to the form.
10           Q.    (BY MR. PAGE:)  You can answer.
11           A.    I can answer?  Can you repeat the
12   question?
13           Q.    Yeah.  How do you know whether or
14   not the -- your technology, your seeper tracer
15   technology, is effective without having a
16   third-party certification?
17                   MR. JOHNSON:  Objection to form.
18                   MR. HALL:  Same objection.
19           A.    I would assume because a
20   third-party certification exists, it has been
21   tested.
22           Q.    (BY MR. PAGE:)  Okay.  But you
23   said you don't follow the requirements of the

Veritext Legal Solutions
800-336-4000

```
 1    certification, correct?
 2           A.    Yes.  But what I'm saying is the
 3    way it's written is not our -- is not what I
 4    follow on the job.  It's not a guide.
 5           Q.    I understand that.  And my
 6    question was, doesn't that have effect on the
 7    results?
 8                 MR. HALL:  Objection.
 9                 MR. JOHNSON:  Objection to form.
10                 MR. HALL:  Calls for speculation.
11           Q.    (BY MR. PAGE:)  You don't know?
12           A.    I'm not a chemist.  So, you know,
13    I'm not the one that developed the
14    certifications, so I can't tell you.
15           Q.    I guess I can also say you've
16    never done environmental sampling before,
17    correct?
18           A.    What do you mean by environmental
19    sampling?
20           Q.    Well, it's a whole area of
21    knowledge.  Have you ever gone out into the
22    environment and collected air, water, or soil
23    samples?
```

Veritext Legal Solutions
800-336-4000

```
 1          A.    I have.

 2          Q.    When did you do that?

 3          A.    Most of the jobs require air

 4    collection.

 5          Q.    Okay.  That's fine.  You are

 6    talking about Linde?

 7          A.    Yes.

 8          Q.    But other than with Linde, have

 9    you ever done any environmental sampling?

10          A.    I have not.

11          Q.    So your whole experience and

12    understanding with regard to environmental

13    sampling is based on what you've done at Linde,

14    correct?

15          A.    Correct.

16          Q.    Do you know if there's any other

17    third-party certifications other than the one

18    that's attached on Exhibit 4?

19          A.    (Reviewing document.)

20          Q.    I think it's page -- it's hard to

21    read.

22          A.    Page 0006?

23          Q.    Yeah, 0006 on the bottom.  Any
```

```
 1      other third-party certifications other than
 2      this one from Mr. Wilcox?
 3              A.      I don't know.
 4              Q.      You never were informed of that?
 5              A.      No.
 6              Q.      Who would know that?
 7                      MR. HALL:  Objection.  Calls for
 8      speculation.
 9              Q.      (BY MR. PAGE:)  If you don't know,
10      just say you don't know.
11              A.      I don't know who would have that
12      information.
13              Q.      Okay.  So let's talk about your
14      training.  Okay.  You said that -- did you say
15      Mr. Harris was the one who trained you?
16              A.      Multiple people trained me.
17              Q.      Okay.  Let's talk about your
18      training with respect to sampling.  How does
19      Linde's process for seeper tracer sample?
20              A.      That's sort of an open-ended
21      question, because there are many different job
22      types.  So I would need to know if it's a
23      pipeline sample or a tank sample.
```

Veritext Legal Solutions
800-336-4000

```
 1          Q.    Fair enough, yeah.  We're talking
 2    about pipeline sampling right now.
 3          A.    Okay.
 4          Q.    And so how does Linde process
 5    sample pipelines for seeper tracer?
 6          A.    Primarily there are two ways.  A
 7    probe installation, which is more of a
 8    permanent installation, or a seeper leak test
 9    using the backpack.
10          Q.    The backpack?
11          A.    Correct.
12          Q.    Okay.  In this particular
13    instance, the one that was -- the project that
14    was performed on the Lazy S Ranch last summer
15    for Valero, which type of sampling was
16    performed?
17          A.    It was the SeeperTrace with a
18    sledding backpack.
19          Q.    Have you ever done that?
20          A.    I have.
21          Q.    How many times?
22          A.    I don't know the exact number, but
23    many times.
```

Veritext Legal Solutions
800-336-4000

```
 1          Q.    Many times, okay.  So how do they
 2    train you to do that type sampling?
 3          A.    There is -- there are videos that
 4    we watch --
 5          Q.    Okay.
 6          A.    -- of somebody sledding.  There
 7    are written guides that we go off of.  And
 8    there are senior technicians that have the
 9    experience that train us.
10          Q.    Who is the senior technician that
11    trained you on sledding?
12          A.    It was Brian Cloniger.
13          Q.    Does he still work with the
14    company?
15          A.    He passed away due to cancer this
16    year.
17          Q.    So you said there's written
18    guidelines?
19          A.    Yes.  We have written guidelines
20    on every procedure that we do.
21               MR. PAGE:  I'm going to need
22    those, David, please.
23               MR. HALL:  We're going to object
```

Page 27

```
 1    to producing those on the basis of trade
 2    secrets.
 3                 MR. PAGE:  Okay.  We'll take that
 4    up with a motion.
 5                 MR. HALL:  Sure.
 6         Q.    (BY MR. PAGE:)  Were you informed
 7    that these guidelines were trade secrets, these
 8    tests?
 9         A.    I would imagine they would be
10    trade secrets.
11         Q.    No, I didn't ask that question.  I
12    asked you whether or not you were informed that
13    these were trade secrets when they trained you
14    on them?
15         A.    No.
16                 MR. JOHNSON:  Objection to form.
17         A.    I mean, I believe I signed an NDA.
18         Q.    (BY MR. PAGE:)  Did you sign an
19    NDA?
20                 MR. JOHNSON:  Objection.  Asked
21    and answered.  Go ahead.
22         Q.    (BY MR. PAGE:)  Go ahead.  Why
23    don't you answer it once for me.
```

Veritext Legal Solutions
800-336-4000

```
 1              A.    I can't remember.
 2              Q.    What about your training on the --
 3      did you have -- let me back up.  Scratch that.
 4                    Did you have to take a test in
 5      order to demonstrate that you're competent at
 6      sledding?
 7              A.    Not an official test.
 8              Q.    Were you examined in any respect
 9      to see whether or not you were competent to
10      sled?
11              A.    I had to demonstrate, yes.
12              Q.    To who?
13              A.    To the senior supervisors.
14              Q.    In the field?
15              A.    At the Tucson location.
16              Q.    There is a location where you sled
17      in Tucson?
18              A.    That's correct.
19              Q.    Is it on the company property?
20              A.    It could be on the company
21      property or it could be on the side of the road
22      in the desert using a typical, you know,
23      terrain --
```

Veritext Legal Solutions
800-336-4000

```
 1          Q.    What is --
 2          A.    -- to simulate.
 3          Q.    Excuse me, I'm sorry.  What is
 4    typical terrain?
 5          A.    It would be just the desert sand,
 6    the desert dirt, just to get the motions
 7    correct, things like that.
 8          Q.    Okay.  Was there any rocks or
 9    brush along this?
10          A.    Yes.
11          Q.    There was rocks?
12          A.    Yes.
13          Q.    How big were the rocks?
14                MR. HALL:  Object to the form.
15          A.    I wouldn't know what size.
16          Q.    (BY MR. PAGE:)  When you did this
17    practice or when you did this training test,
18    were there rocks larger than your fist?
19          A.    Yes.
20          Q.    Piled together?
21          A.    That would be a specific instance.
22    I don't remember the rock sizes.
23          Q.    Do you remember having to go over
```

Veritext Legal Solutions
800-336-4000

```
1    good size boulders that are stacked together in
2    order to perform your sledding test?
3                MR. HALL:  Object to the form.
4          A.   No.
5          Q.   (BY MR. PAGE:)  Okay.  Have you
6    ever sledded over boulders on a site?
7          A.   Not a boulder, no.
8          Q.   Okay.  Have you ever sledded over
9    a previous excavation or rocky area that was
10   refilled and on the top there is a stack of
11   rocks that were excavated?
12         A.   I have sledded over previous
13   excavation, but I can't speak about the rocks.
14         Q.   Was there a rock crown on that
15   excavation, or was it soil?
16         A.   No.  It was just dirt.
17         Q.   Just dirt.  What about bushes,
18   have you sledded over bushes?
19         A.   I have.
20         Q.   How big?
21         A.   Chest height.
22         Q.   Okay.  And how did you maintain
23   the contact with the ground on the sledding
```

Veritext Legal Solutions
800-336-4000

```
 1   shoe?

 2          A.    You stomp through the bush and

 3   stick the sled inside the bush so you're

 4   staying on the line.  If the bush is too big,

 5   we would go to the side of the bush, which is

 6   usually within the three feet.

 7          Q.    Well, what if the bush is wider

 8   than three feet?

 9                MR. JOHNSON:  Objection.

10   Speculation.

11          A.    I would -- if the bush is or an

12   obstacle is too big to go around, we would note

13   that in the notes.

14          Q.    In the notes?

15          A.    Yes.

16          Q.    Were there notes taken on this job

17   on the Lazy S Ranch as to the sledding and

18   sampling?

19          A.    I wasn't on site, so I don't know

20   of any notes.

21          Q.    Have you reviewed the

22   documentation of the records that are available

23   for this particular tracer test?
```

Veritext Legal Solutions
800-336-4000

```
 1              A.    I have reviewed some records, yes.
 2              Q.    What records have you reviewed?
 3              A.    There was a summary of the job.
 4                    (Whereupon, Linde Exhibit
 5                    6, having been previously marked
 6                    for identification, was referenced
 7                    in this deposition.)
 8              Q.    Would you look and tell me whether
 9        or not Exhibit 6 is the summary you may have
10        reviewed?
11              A.    Yes.
12              Q.    Okay.  Anything else beyond that?
13              A.    I did look at the inoculation
14        notes.
15                    (Whereupon, Linde Exhibit
16                    5, having been previously marked
17                    for identification, was referenced
18                    in this deposition.)
19              Q.    Okay.  And would you please take a
20        look at Exhibit Number 5, looks kind of like
21        this (indicating), and tell me whether that's
22        the other document you looked at for this
23        matter.
```

Veritext Legal Solutions
800-336-4000

```
1            A.    I did not actually see this.
2            Q.    Okay.  So what inoculation notes
3     did you review?
4            A.    It was the SeeperTrace piping
5     info.
6            Q.    And what's the Bates number on
7     that page?
8            A.    L 0025.
9            Q.    So that's on the first exhibit I
10    asked you to pull out, Exhibit Number 6,
11    correct?
12           A.    Yes.
13           Q.    Okay.  Did you -- I asked you to
14    look at Exhibit Number 5.  You didn't look at
15    that, those particular notes?  It looks like
16    this, sir (indicating).
17           A.    Oh, yes.  No, I did not see this
18    page.
19           Q.    Okay.  Could you look through?
20    There are several pages there, just to make
21    sure.
22           A.    I did not see that, no.
23           Q.    Keep looking.  There's some


                                     Page 34
```

1    handwritten pages.  I just want to make sure.

2         A.    Yeah, the handwritten notes I did

3    not see, no.

4         Q.    Okay.  Now, you looked through the

5    whole Exhibit Number 5 and you didn't review

6    any of that?

7         A.    No, I did not.

8         Q.    So other than what we've seen on

9    Exhibit 6, do you remember any other documents

10   that you reviewed?

11        A.    Yes.  I believe it was L 0030 I

12   saw.

13        Q.    Okay.  L 0030?

14        A.    In Exhibit 6.

15        Q.    Still on Exhibit 6.  Okay.  Maybe

16   we'll go through that in a little bit and go

17   through and see if there's anything else.

18              Is it typical for the person

19   that's doing the sampling, the sledding, to

20   keep notes as they're doing the sledding?

21        A.    We encourage notes in case there's

22   an obstacle.

23        Q.    Encourage notes?

Page 35

```
 1            A.    Yes.

 2            Q.    Do they write down like what area

 3    they were sledding for a particular sample?

 4            A.    Typically, no.

 5            Q.    Not typical.  Do they write down

 6    the amount of time that was taken for the

 7    sample?

 8            A.    Yes.

 9            Q.    Okay.  And where are those notes?

10    Is that typically part of the record?  Let me

11    change that question.  Is that typically part

12    of the record?

13            A.    We have a sheet that is carried on

14    the person where notes are taken.

15            Q.    Okay.  And what -- are there

16    columns or requests for information?

17            A.    There are columns.

18            Q.    Okay.  Are they blank?

19            A.    Yes.

20            Q.    So the sampler decides what

21    information he's going to record?

22            A.    That is correct, yes.

23            Q.    There are no dictates or
```

Page 36

1    requirements for information that needs to be
2    recorded?
3         A.    Isn't that the same question?   I'm
4    sorry.
5         Q.    Well, the sampler decides, okay.
6    So my question, then, is just to clarify.
7    Is -- are there any dictates or requirements
8    for what information is collected?
9         A.    Yes.   There are specific columns,
10   specific information that needs to be filled
11   out.
12        Q.    Okay.  So those columns are
13   labeled?
14        A.    Yes.
15        Q.    Okay.  What are the labels?  What
16   information needs to be filled out?
17        A.    I don't have it in front of me,
18   but I know we have tube numbers.  We have a
19   space for notes that would be for -- say you're
20   at a road crossing and you want to know the
21   road was there where you put the flag down just
22   to identify something we could come back to or
23   make it easier.

Veritext Legal Solutions
800-336-4000

```
 1          Q.    Does the person have one page for
 2    notes on this chart for the whole job, or do
 3    they have one page they fill out for each
 4    sample?
 5          A.    One page will hold many samples.
 6    When that fills up, they go to a new page.
 7          Q.    Is the information where the
 8    sample was taken by either some kind of GPS or
 9    some other kind of marker noted on this page?
10          A.    Yes, we use flags.
11          Q.    Flags?
12          A.    Correct.
13          Q.    Are there pictures taken of the
14    flags that accompany this?
15          A.    No.
16          Q.    So how does the piece of paper,
17    these notes, designate the area that was
18    sampled?
19          A.    We delineate the sections, and we
20    write a letter or number on each flag as we go.
21          Q.    And that's also recorded on these
22    notes, these sampling notes?
23          A.    Correct.
```

Veritext Legal Solutions
800-336-4000

```
 1          Q.    Okay.   What else is on those
 2    sampling notes?
 3          A.    We encourage the techs to write
 4    whatever they feel would be of significance; if
 5    the wind is blowing hard, if there was a truck
 6    nearby, they may contaminate the area, anything
 7    that would help the detective work that's
 8    involved with finding a leak.
 9          Q.    Does the sheet require any
10    specific information to be placed on there, or
11    is that the judgment of the sampler?
12          A.    As far as the notes, that's the
13    judgment of the sampler, but the tube numbers
14    are listed there.
15          Q.    On these notes?
16          A.    Yes.
17          Q.    Okay.   And what else is required
18    or always on these notes?
19          A.    The flag sections are listed.
20          Q.    So if flag number one and number
21    two were used to designate the area that was
22    sledded for the first sample, would that be on
23    the chart typically?
```

```
 1          A.    It would be, yes.

 2          Q.    Okay.  Do you know whether flags

 3    were used in this particular case?

 4          A.    I was not on site, but that is the

 5    standard procedure.

 6          Q.    Okay.  But you can't validate that

 7    one way or the other?

 8          A.    I cannot validate that.

 9          Q.    Did you ever talk to Mr. Norton

10    who did do the sampling on this site?

11          A.    About this job, I have not.

12          Q.    Never have.  What about Mr. Ray

13    Cimijotti?

14          A.    Cimijotti.

15          Q.    Cimijotti.  Did you ever speak to

16    him about what work he did on the site?

17          A.    Regarding the flags, I did not

18    speak to him.

19          Q.    No, not the flags, any work he

20    did.  Do you know what Ray Cimijotti did on

21    this job?

22          A.    I believe he inoculated.

23          Q.    Okay.  Did you visit with him
```

Veritext Legal Solutions
800-336-4000

```
 1     about the inoculation or any of the work he
 2     performed on this job for Valero?
 3          A.    I did not speak about the job
 4     itself, no.
 5          Q.    You did not speak to Mr. Cimijotti
 6     about the job he performed?
 7          A.    I was filling in for Alan Harris
 8     at the time, and I did the scheduling for them
 9     to go out to the site.  That was pretty much
10     the extent of it until I got the data back and
11     wrote the report.
12          Q.    Okay.  So when you got what data
13     back?
14          A.    The findings.
15          Q.    Which are in front of you under
16     Exhibit Number 6?
17          A.    Yes.  This is a typical job log
18     that we --
19          Q.    Is that the one you used?
20          A.    It looks like it, yes.
21          Q.    Okay.  Was there anything else
22     that you used that you refer to as findings to
23     write the report?
```

```
 1          A.    We have the chroms, the
 2    chromatogram, that have the actual data on
 3    them.
 4          Q.    Did you review that?
 5          A.    I did not, but my boss did.
 6          Q.    Who's your boss?
 7          A.    Alan Harris.
 8          Q.    So he reviewed it.  And did he
 9    review your report?
10          A.    Yes.
11          Q.    He reviewed it before it went out?
12          A.    Yes.
13          Q.    Each draft?
14          A.    I don't know if it was each draft.
15    I believe the first draft was crafted by me,
16    and then when he returned from his vacation, we
17    worked on it together.
18          Q.    How many drafts went back and
19    forth between the time you wrote your first
20    draft and sent it to Mr. Mullen at Valero and
21    then you showed it to Mr. Harris when he got
22    back from vacation?
23          A.    I only had the one draft.  I would
```

Veritext Legal Solutions
800-336-4000

```
 1    just start with the one draft, and if it needs
 2    work, then we go from there.
 3         Q.    Okay.  So how many drafts were
 4    performed for this job until you got the final
 5    report?
 6         A.    I don't remember the number of
 7    drafts.
 8         Q.    More than one, correct?
 9         A.    Yes.
10         Q.    And Mr. Mullen commented on each
11    draft, did he not?
12              MR. JOHNSON:  Objection.  Form.
13         A.    I don't know how many comments he
14    made for each draft.
15         Q.    (BY MR. PAGE:)  Did he make
16    comments on the drafts?
17         A.    He did.
18         Q.    And you accepted all of them, did
19    you not?
20              MR. JOHNSON:  Objection to form.
21         A.    I would have to look at every
22    e-mail for that.
23         Q.    (BY MR. PAGE:)  Can you recall any
```

Veritext Legal Solutions
800-336-4000

```
 1    suggestion, comment made by Mr. Mullen that was

 2    not accepted by you when you wrote this report?

 3         A.    I cannot remember.

 4         Q.    Can't remember?

 5         A.    No.

 6         Q.    Okay.  Did Mr. Harris give you any

 7    guidelines as to what should be in the report?

 8         A.    We -- we had to find a general

 9    seeper how-to that was requested by Valero to

10    add to the report, and he helped me find that

11    because they are buried in the share drives

12    that we have at work and a lot of folders to go

13    through.  So he did help me find that.  He's

14    been there thirty years, so --

15         Q.    So Mr. Mullen wanted to add to the

16    report by putting some general explanation of

17    the seeper tracer technology that's done?

18         A.    Yes, I remember that.

19         Q.    Is that typical?

20         A.    Typically we do not do a report

21    for a seeper job.

22         Q.    Do you have a template for this

23    report, some kind of a go-by or a basic
```

Page 44

```
 1    template?
 2           A.     I started with my typical
 3    government cover sheet which I use on military
 4    bases and for government sites.
 5           Q.     Okay.
 6           A.     Which is a certain format that I'm
 7    used to.
 8                  MR. HALL:  His question was, do
 9    you have a typical form for a seeper job, not
10    what you did.
11           A.     For a seeper job, no, there is no
12    typical form for a seeper job.
13                  MR. HALL:  Listen carefully to his
14    question, please.
15                  MR. PAGE:  Thank you, Mr. Hall.
16           Q.     (BY MR. PAGE:)  For seeper tracer
17    jobs, are reports typically issued to the
18    customer?
19           A.     No.
20           Q.     Why was a report issued in this
21    particular circumstance, if you know?
22           A.     Valero requested something in
23    writing, and I put the findings in writing in a
```

Page 45

```
 1    report.
 2           Q.    Okay.  And did you get any
 3    guidance from Mr. Harris other than for a
 4    description of the process as to what should be
 5    in the report?
 6           A.    I can't remember exactly what we
 7    talked about as far as adding or -- adding
 8    anything to the report.
 9           Q.    The materials that you attach to
10    the report, I guess, or made part of the report
11    describes the process and technology used in
12    the seeper tracer?
13           A.    It is a general description.
14           Q.    Okay.  Was it followed in this
15    circumstance, that is, this case for Valero?
16           A.    I wasn't on the site.  I did not
17    do the walking, the sledding, or the
18    analyzation, so I do not know.
19           Q.    Just to be clear, did you not
20    speak to any of the on-site Linde people to
21    determine what work they did?
22               MR. JOHNSON:  Objection to form.
23           Q.    (BY MR. PAGE:)  Work they did for
```

1    Valero on that site.

2           A.    I did not speak to them, but I

3    assume the job was completed.

4           Q.    Okay.  That was an assumption,

5    though?

6           A.    Yeah.

7           Q.    Did you speak to them about what

8    they did, how it was completed?

9           A.    No.  I received the results, and I

10   put the report together.

11          Q.    Okay.  Have you ever heard of a

12   certification on one of these jobs, the seeper

13   tracer jobs?

14          A.    I have not, no.

15          Q.    Have you heard of a certification

16   on a tank integrity job?

17          A.    Yes.

18          Q.    Okay.  But certifications aren't

19   provided for on seeper tracer jobs for

20   pipelines, correct?

21          A.    I have never done a certification.

22          Q.    Okay.  For a pipeline?

23          A.    Correct.

Veritext Legal Solutions
800-336-4000

```
 1          Q.    Have you done one for a tank?
 2          A.    Yes.
 3          Q.    What is the difference, if you can
 4     tell us?  What type of information was
 5     collected and analyzed for your tank
 6     certification that's not done on a seeper
 7     tracer pipeline cert review?
 8          A.    The difference would be government
 9     jobs have different requirements.  State --
10     states have different requirements for tank
11     testing.  And there are certain time intervals
12     that are different on government jobs, and so I
13     adhere to those rules for their certifications.
14          Q.    Is it fair for me to assume that
15     there weren't rules such as that for this
16     pipeline evaluation for Valero?
17          A.    I -- I wouldn't know the answer to
18     that.
19          Q.    You didn't know that before you
20     wrote the report?
21          A.    The tracer technology is the same
22     across any job.  It's either tracer is there or
23     tracer is not there.  As far as the
```

Page 48

```
1    certification goes, like I said, the government
2    job is different from the seeper job.
3         Q.    Seeper job, okay.  Would you talk
4    a little bit for us about your training for the
5    laboratory analysis for seeper tracer work?
6    Would you explain that to us, please?
7         A.    Is there a specific question?
8    It's a huge, huge topic.
9         Q.    Well, do you recall how you were
10   trained to do analytical work?
11        A.    Yes.  We have a lab in Tucson
12   where the lab manager trains us on the basics
13   of the GC operation.
14        Q.    Okay.  And who's the lab manager?
15        A.    At the time I was trained, it was
16   Larry Shinmeir who is no longer with the
17   company.
18        Q.    Okay.  Who's the lab manager now?
19        A.    It is Takahiro Sakamoto.
20        Q.    Okay.  And was he the lab manager
21   at the time you -- let me back up.  Let me
22   strike that.
23               Do you know when the seeper tracer
```

1     work was done for Valero that we're talking

2     about here today?

3          A.     When the job was done?

4          Q.     Yes.

5          A.     I don't know the exact dates, but

6     it was I believe in June.

7          Q.     Okay.  And the inoculation was

8     sometime before that, correct?

9          A.     The inoculation typically kicks

10    off the start of the job.

11         Q.     And how long do you usually wait

12    between inoculation and sledding to do the job?

13         A.     If there's a known leak and the

14    client wants us to find a leak, we try to do it

15    as quickly as possible.  So we try to sled the

16    same day.

17         Q.     Otherwise?

18         A.     Otherwise, we wait for the tracer

19    to surface over the next day or two.

20         Q.     You usually wait a day or two?

21         A.     Typically it comes up the second

22    day after the inoculation.

23         Q.     Okay.  So how do you know when the

Veritext Legal Solutions
800-336-4000

```
 1    tracer has come up?

 2            A.    We find it by sledding.

 3            Q.    Okay.  Can you recall any jobs

 4    where the sledding occurred more than a week

 5    after the inoculations and the tests?

 6            A.    I cannot recall anything beyond a

 7    week.

 8            Q.    Okay.  Okay.  So we're talking

 9    about lab training.  I'll give it more context,

10    I think, here.

11            A.    Okay.

12            Q.    So the lab analysis for seeper

13    tracer uses what kind of a device?

14            A.    A gas chromatograph.

15            Q.    Okay.  Do you know what type of

16    detector is used on the gas chromatograph

17    that's used by Linde?

18            A.    I do not.

19            Q.    Have you been trained, other than

20    the training by Linde, on how to use a gas

21    chromatograph?

22            A.    No.

23            Q.    Have you done any gas
```

Page 51